UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| **GLENDA ELSIK,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. V-06-41** |
| | § | |
| **REGENCY NURSING CENTER** | § | |
| **PARTNERS OF KINGSVILLE, LTD.** | § | |
| **d/b/a KINGSVILLE NURSING &** | § | |
| **REHABILITATION CENTER,** | § | |
| **KINGSVILLE NURSING &** | § | |
| **REHABILITATION CENTER, INC.,** | § | |
| **REGENCY NURSING &** | § | |
| **REHABILITATION CENTERS, INC.,** | § | |
| **and HEBER LACERDA** | § | |
| | § | |
| **Defendants.** | § | |

## MEMORANDUM OPINION & ORDER

Pending before the court is Defendants' Motion for Summary Judgment (dkt. #24).  After considering the motion, response, and applicable law, the court is of the opinion that the motion should be GRANTED.

### Facts and Procedural History

Plaintiff ("Elsik") filed suit against her employer for race, national origin, and sex discrimination, intentional infliction of emotional distress, and slander after her supervisor sought to transfer her to a different location.  Elsik brought suit against four defendants: (1) Regency Nursing Center Partners of Kingsville, Ltd. d/b/a Kingsville Nursing and Rehabilitation Center ("RNCP"), Elsik's employer engaged in the business of operating a long term health care facility with approximately 100 employees; (2) Kingsville Nursing and Rehabilitation Center, Inc. ("KNRC"), which is the general partner of RNCP with no employees; (3) Regency Nursing and

Rehabilitation Centers, Inc. ("RNRC"), the management company of a number of long term health

care facilities with 18 employees; and (4) Heber Lacerda ("Lacerda"), Chief Executive Officer and

President of RNRC.

In May 2001, Elsik was employed by Defendant RNCP as an Administrator. As

Administrator, Elsik was the senior executive at the Kingsville facility and was responsible for

managing the building, resources, staff and supplies. According to Lacerda, she performed her job

well from a business perspective in that she met all the facilities financial goals and increased

profitability.[1]  However, Defendants contend Elsik's "people" skills were lacking and eventually

became a major problem for the company. Her performance evaluations in 2002 and 2003 described

her difficulty with interpersonal relationships.[2]

After receiving several complaints about Elsik's management style, a year-end

supervisor/administrator survey was conducted by the Vice President of RNRC in October 2003.

Twenty randomly selected RNCP employees were solicited to answer open-ended questions about

---

[1]  D.'s M.S.J. (dkt. #24), Ex. A,  Lacerda's Affidavit, ¶ 5.

[2]  *Id.* Ex. C, Villanueva's Affidavit, ¶ 3.  *See id.* at 7–November 16, 2002 employee
evaluation signed by Elsik– "Glenda is quite demanding with her staff and has very high
expectations.  At times she can be condescending with her staff, but this is only because she
wants them to succeed.  She has a low tolerance for individual who do not give 100% with all
efforts and for those who lack enthusiasm.  This can be both a strength and a weakness due to
employees different personalities." *See id.* at 8–9–December 10, 2002 employee
evaluation–lowest scores in the personality and tact and courtesy categories; "Overly aggressive
toward families and employees at times; *see id.* at 10–11–December 24, 2003 employee
evaluation –"Glenda had a difficult time this year with her staff stability.  She expects a lot from
her staff and is demanding which sometimes can come across as over bearing and
condescending.  She trusts that her staff is doing their jobs but often fails to verify that the job
was being doing appropriately.  Glenda needs to listen more to her staff; sometimes it is difficult
to get a word in because she dominates the conversation.  It is difficult to approach Glenda with
concerns because she becomes very defensive.  It is difficult for Glenda to meet people half way;
policy is policy."

2

the Administrator.[3]  Many negative responses were received concerning Elsik's interpersonal skills, including comments that Elsik was rude with family and staff, got loud and aggressive during conflicts, did not treat staff with respect, and demeaned staff.[4]   The surveys also indicated that the staff were afraid they would lose their job if they spoke out about their concerns.[5]  When confronted with these findings, Elsik became "defensive and [was] concerned only with identifying those employees who reported negative comments about her."[6]

At the beginning of 2004, RNCP also implemented a compliance program in an overall effort to promote and monitor compliance with company policies and government regulations.   A corporate compliance telephone hotline was set up, and Kathy Clark served as the Corporate Compliance Officer.[7]  After receiving several verbal and written complaints regarding Elsik from staff and residents' family members, Clark initiated an investigation of Elsik in March 2004.[8]  The employees interviewed by Clark confirmed the complaints that Elsik was "unfair, rude, prejudiced and show[ed] inappropriate behavior" and they feared retaliation for complaining.[9]  One employee characterized her as a "hormonal and racist administrator."[10]

---

[3]  *Id.*, Ex. D, Ric Marti Affidavit, ¶ 2.

[4]  *Id.* at 6–7.

[5]  *Id.*

[6]  *Id.,* Marti Affidavit, ¶ 4.

[7]  *Id.* ¶ 7; *see also id.*, Ex. E, Kathy Clark Affidavit, ¶ 3.

[8]  *Id.* at ¶ 4.

[9]  *Id.* at 14.

[10]  *Id.* at 9.

3

On April 1, 2004, Elsik participated in a meeting called by Lacerda and Janice Villanueva, Vice President of Operations for RNRC,[11] to discuss the findings outlined in Kathy Clark's March 25, 2004 compliance investigation report.[12]  Elsik asserts that during this meeting Lacerda made several derogatory remarks, including calling her a racist.  Defendants maintain that they were only communicating the findings of the survey conducted by the corporate compliance officer.  Elsik was presented with an employee counseling report based on the investigation.  The report indicated that she was being put on probation for 90 days based on the investigation and the numerous complaints regarding Elsik's behavior. The report explained that any further complaints could result in immediate termination.  The counseling report was not signed by either party, but Elsik admitted receiving it after the meeting.[13]

Elsik's conduct also garnered attention at the April 15, 2004 Board of Directors meeting.[14] The Board discussed the facility complaint investigations, including the March 25, 2004 investigation of anonymous complaints submitted to the compliance program relating to the "Administrator's behavior towards the employees."[15] The Board resolved to monitor the Administrator weekly or bi-weekly by interviewing the staff.

Further issues surfaced after Elsik was put on probation including allegations that she resisted two subpoenas by supplying incomplete information and failing to fully cooperate with the

---

[11]  *Id.*, Ex. C, Villanueva Affidavit, ¶ 2.

[12]  *Id.* at ¶ 5.

[13]  *Id.,* Ex. B, Elsik's Depo., p. 32.

[14]  *Id.*, Ex. C, Villanueva Affidavit, ¶ 9.

[15]  *Id.,* Ex. A, Board Minutes, p. 16.

Kingsville Police Department in an investigation of resident neglect and abuse.[16] An investigation by the Department of Health and Human Services was also initiated because Elsik had violated HIPAA non-disclosure obligations by leaving a termination notice of a resident on the doorstep of a family member with protected health information contained in the file.[17] Further, the facility was found to be noncomplaint during audits with respect to areas which Elsik, as Administrator, was responsible for.[18]  On July 27, 2004, a resident's family member also complained about Elsik's "racist attitude to residents and family members and staff."[19]  Finally, the facility was cited for failing to conduct the appropriate background checks of potential employees before hiring them in violation of government regulations.[20]

On October 14, 2004, Plaintiff had another meeting with Lacerda.  She claims he told her that she did not fit into the Hispanic community in Kingsville and she would be a better fit in the Yoakum community because it was predominantly white, while Lacerda maintains that he "reminded [her] of the numerous employee and family member complaints made against her, including those alleging she was a racist."[21]  During this meeting, Lacerda offered Elsik a lateral transfer to the Yoakum facility as Administrator, with the same job responsibilities and rate of pay. Elsik argues that the Yoakum transfer was an adverse employment action because the facility was

---

[16] *Id.,* Ex. A, K.P.D. Report, p. 20.

[17] *Id.* at 29.

[18] *Id.* at 34.

[19] *Id.* at 39–40.

[20] *Id.* at 45.

[21] *Id.*, Lacerda Affidavit, ¶ 12.

smaller and less reputable.  He told her that if she did not accept the transfer he would have to fire her.  Elsik initially indicated she was eager about the transfer and a "fresh start,"[22] but later resigned on October 27, 2004.

Elsik was replaced by an interim administrator, a Hispanic male.  Under state regulations, a long term healthcare facility may not be without an administrator for more than 30 days.[23]  Therefore, RNCP had to temporarily replace Elsik with a Hispanic male because her permanent replacement had not finished her licensing requirements.[24]  Her permanent replacement was a Hispanic female.

Elsik filed a complaint with the EEOC on October 18, 2004 charging RNRC with race, age and sex discrimination based on the October 14, 2004 meeting.  She asserted that she was discriminated against on the basis of her sex and race because Lacerda told her she did not fit into the Hispanic community in Kingsville, but she would fit better in Yoakum, and that is why she was forced to transfer.[25]  She filed a lawsuit in state court on March 10, 2006, which was removed to federal court.  Elsik seeks damages for intentional discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, the Civil Rights Act of 1866, 42 U.S.C. § 1981 and the Texas Commission on Human Rights Act ("TCHRA"), TEX. LAB. CODE § 21.001(1).  Elsik also claims intentional infliction of emotional distress and slander based on Lacerda's comments.

RNCP maintains that its decision to offer Elsik the transfer resulted from the culmination of

---

[22] *Id.,* Ex G, Email from Elsik to Lacerda, p. 9.

[23] *Id.,* Ex. A, Lacerda Affidavit ¶¶ 13–14; *see also id.*, Ex. G., Email from Lacerda to Elsik 10/15/04, p. 8.

[24] *Id.*

[25] Ex. G., EEOC Charge of Discrimination, p. 11.

repeated problems with Elsik's staff and resident relations at the Kingsville facility and compliance issues. The decision was made to eliminate the hostile work environment the management believed Elsik was creating at the Kingsville facility.[26] Defendants believed that it was their legal obligation to take prompt remedial action to either transfer or fire Elsik when it knew that a hostile work environment existed.[27]

## Summary Judgment Standard

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *Christopher Village, L.P. v. Retsinas*, 190 F.3d 310, 314 (5th Cir. 1999). The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment, there must be an absence of any genuine issue of material fact. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-248 (1986). An issue is "material" if its resolution could affect the outcome of the action. *Daniels v. City of Arlington, Tex.*, 246 F.3d 500, 502 (5th Cir. 2001), *cert. denied*, 122 S.Ct. 347 (2001).

The moving party bears the initial burden of informing the court of all evidence demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Only when the moving party has discharged this initial burden does the burden shift to the non-moving party to demonstrate that there is a genuine issue of material fact. *Id.* at 322. If the moving party fails to meet this burden, then they are not entitled to a summary judgment and

---

[26] *Id.*, Ex. A, Lacerda Affidavit, ¶ 11.

[27] *Id.* at ¶ 15.

no defense to the motion is required.  *Id.*

"For any matter on which the non-movant would bear the burden of proof at trial . . . , the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial." *Transamerica Ins. Co. v. Avenell*, 66 F.3d 715, 718-19 (5th Cir. 1995); *Celotex*, 477 U.S. at 323-25.  To prevent summary judgment, the non-movant must "respond by setting forth specific facts" that indicate a genuine issue of material fact.  *Rushing v. Kan. City S. Ry. Co.*, 185 F.3d 496, 505 (5th Cir. 1999).

When considering a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in favor of the non-movant.  *In re Segerstrom*, 247 F.3d 218, 223 (5th Cir. 2001); *Samuel v. Holmes*, 138 F.3d 173, 176 (5th Cir. 1998).  The court must review all of the evidence in the record, but make no credibility determinations or weigh any evidence, disregard all evidence favorable to the moving party that the jury is not required to believe, and give credence to the evidence favoring the nonmoving party as well as to the evidence supporting the moving party that is uncontradicted and unimpeached.  *Willis v. Moore Indep. Sch. Dist.*, 233 F.3d 871, 874 (5th Cir. 2000).  However, the non-movant cannot avoid summary judgment simply by presenting "conclusory allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation." *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994) (en banc).

## Discussion

Title VII proscribes an employer from discharging or otherwise discriminating against any

individual because of an individual's race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a)(1).[28] "The Title VII inquiry is whether the defendant intentionally discriminated against the plaintiff." *Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 651 (5th Cir.2004) (internal quotation marks and citations omitted). Title VII claims are analyzed under the framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Ward v. Bechtel Corp.*, 102 F.3d 199, 202 (5th Cir. 1997). Under this framework, a plaintiff must first create a presumption of intentional discrimination by establishing a prima facie case. *Id.* The burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000). If the employer sustains its burden, the burden shifts back to the plaintiff to establish either: (1) that the employer's proffered reason is not true but is instead a pretext for discrimination; or (2) that the employer's reason, while true, is not the only reason for its conduct, and another "motivating factor" is the plaintiff's protected characteristic. *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004).

To establish a prima facie case of sex, race, or national origin discrimination under Title VII, Elsik must show: (1) she is a member of a protected class; (2) she was qualified for the position she sought; (3) she suffered an adverse employment action; and (4) that her employer sought to replace her with a similarly qualified non-white male. *Ward*, 102 F.3d at 202. The evidence establishes that Elsik was a member of a protected class (white, American, female), she was qualified for the

---

[28]    Each of Elsik's claims for discrimination under Title VII, § 1981 and the TCHRA are analyzed under the same legal framework. *See* 42 U.S.C. § 1981(a) (providing equal rights under the law and prohibiting discrimination on the basis of race). The Texas Labor Code provides a cause of action for discrimination in the workplace. Texas Commission on Human Rights Act (TCHRA) is interpreted in a manner consistent with federal laws prohibiting employment discrimination. *Lottinger v. Shell Oil Co.,* 143 F. Supp. 2d 743 (S.D. Tex. 2001).

position of Administrator and she was replaced by a younger Hispanic male.  Therefore, the relevant inquiry facing the court is whether Elsik suffered an adverse employment action.

Elsik maintains that the transfer to Yoakum constituted an adverse employment action because the Yoakum facility was smaller, less reputable and less profitable.  The Yoakum facility was also further from her home and would require her to relocate, primarily at her own expense. Alternatively, Elsik contends she was constructively discharged because she was given an ultimatum to transfer or be discharged and the racist remarks made to her by her supervisor made her working environment so intolerable she had to resign.

## I.   Adverse Employment Action

Title VII makes it unlawful for an employer "to refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment" based on sex, race, or national origin.  42 U.S.C. § 2000e-2(a)(1); *see Breaux v. City of Garland*, 205 F.3d 150, 157 (5th Cir.2000) ("Adverse employment actions are discharges, demotions, refusals to hire, refusals to promote, and reprimands.").

### A.   Transfer

It is well established that the denial of a purely lateral transfer is not an adverse employment action redressable under Title VII.  *See Burger v. Cent. Apartment Mgmt., Inc.*, 168 F.3d 875, 879 (5th Cir.1999) ( "Refusing an employee's request for a purely lateral transfer does not qualify as an ultimate employment decision [actionable under Title VII].").  As the often-quoted Chief Judge Posner explained:

> Obviously a purely lateral transfer, that is, a transfer that does not involve a demotion in form or substance, cannot rise to the level of a materially adverse employment action.  A transfer involving no reduction in pay and no more than a minor change in working conditions will not do, either.  Otherwise every trivial personnel action

that an irritable, chip-on-the-shoulder employee did not like would form the basis of
a discrimination suit.

*Williams v. Bristol-Myer Squibb Co.*, 85 F.3d 270, 274 (7th Cir. 1996). However, in certain instances, a lateral transfer may be deemed a demotion, and qualify as an adverse employment action, if the lateral transfer is objectively less prestigious or less interesting within an organization. *Alvarado v. Texas Rangers*, 2007 WL 2028917, *3 (5th Cir. 2007). Whether the new position is worse is an objective inquiry; thus, a plaintiff's subjective perception that a demotion has occurred is not enough. *Id.*; *see also Hunt v. Rapid Healthcare Sys., LLC,* 277 F.3d 757, 771 n.8 (5th Cir. 2001) ("[T]he focus is on the objective qualities of the positions, rather than an employee's subjective preference for one position over another.").

Other than Elsik's conclusory allegations that the Yoakum facility was less profitable and less reputable, the transfer would have had no material effect on Elsik's job: the job title was the same, the day-to-day responsibilities were the same, the pay was the same, and the other benefits did not differ. Additionally, Elsik's preference for staying at the Kingsville facility to avoid relocating does not change the fact that the position offered to her in Yoakum was a purely lateral transfer. Elsik has not presented any objective evidence that the Yoakum facility was considered less desirable or viewed as a demotion within the RNCP organization. Elsik's subjective views about the desirability of the transfer and the Yoakum facility do not create an adverse employment action. *See Forsyth v. City of Dallas*, 91 F.3d 769, 774 (5th Cir. 1996) ("[A] plaintiff's subjective perception that a demotion has occurred is not enough."). Thus, because Elsik has not come forward with any objective evidence that a transfer to the Yoakum facility was adverse or would have reasonably been viewed as a demotion, the court finds that the lateral transfer was not an adverse employment action.

### B.        Constructive Discharge

Constructive discharge occurs when an employee resigns her position under circumstances that are treated as an involuntary termination of employment. *Haley v. Alliance Compressor, LLC,* 391 F.3d 644, 649 (5th Cir. 2004). Constructive discharge can form the basis of a Title VII claim. *Harvill v. Westward Communications, LLC,* 433 F.3d 428, 439 (5th Cir. 2005); *Ward v. Bechtel Corp.*, 102 F.3d 199, 202 (5th Cir. 1997). To show constructive discharge, an employee must offer evidence that the employer deliberately made the employee's working conditions so intolerable that a reasonable employee would feel compelled to resign. *Id.* Whether a reasonable employee would feel forced to resign is a fact specific inquiry. *Haley,* 391 F.3d at 649. The court may consider several factors, none of which are dispositive: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status. *Brown v. Kinney Shoe Corp.*, 237 F.3d 556, 566 (5th Cir. 2001). Additionally, "discrimination alone, without aggravating factors, is insufficient for a claim of constructive discharge." *Id.* Constructive discharge requires a greater degree of harassment than that required for a hostile environment claim. *Haley*, 391 F.3d at 650. The resigning employee bears the burden of proving constructive discharge. *Id.*

Elsik contends she was constructively discharged because the "forced" transfer was presented by way of an ultimatum and the racist remarks made by Lacerda made her working conditions so  intolerable she felt compelled to resign. Considering the factors established by the Fifth Circuit, the lateral transfer offered to Elsik was not a demotion, did not reduce her salary or

12

job responsibilities or reassign her to menial or degrading work.  Further, viewing the facts in a light most favorable to Elsik, the court will assume *arguendo* that Lacerda made the racist remarks alleged by Elsik.  The remarks were made in two separate closed-door meetings with only Elsik and her supervisors present.[29]  These two discrete instances do not create the kind of badgering and harassment that show the employer's actions were calculated to encourage Elsik to resign.  *See McKethan v. Tex. Farm Bureau*, 996 F.2d 734, 741 (5th Cir. 1993) (affirming summary judgment in favor of employer where the resigning employee's embarrassment after being singled out and admonished at an awards banquet was not sufficient to show constructive discharge); *Hill v. K-Mart Corp.*, 699 F.2d 776, 779 (5th Cir. 1983) (finding racial slurs by co-workers and transfer were insufficient to prove constructive discharge).  Elsik also claims the ultimatum given to her, resulting in a "forced" transfer would lead a reasonable employee to resign.  However, as discussed previously Elsik was offered a lateral transfer in the same position, with the same job responsibilities, at the same rate of pay.  *See Jurgens v. EEOC*, 903 F.2d 386, 391–92 (5th Cir. 1990) (concluding a mere change of position or job responsibilities, without more, will not support a claim for constructive discharge).  Although Elsik may have viewed the transfer as undesirable, an offer for a lateral transfer would not be viewed by a reasonable employee as an intolerable working condition or a legitimate reason to resign. *Jett v. Dallas Indep. Sch. Dist.*, 798 F.2d 748, 755 (5th Cir. 1986) (noting constructive discharge cannot be based upon the employee's subjective preference for one position over another).  Elsik simply has not demonstrated that her situation was "so difficult or unpleasant that a reasonable person in her shoes would have felt compelled to resign."  *See*

---

[29]  P.'s Resp. (dkt. #32), Ex. A, Elsik Affidavit, ¶ 4 ("Lacerda, in closed-door meetings with me and other co-workers, repeatedly called me a racist.").

*Bourque v. Powell Elec. Mfg. Co.*, 617 F.2d 61, 65 (5th Cir. 1980).  Because Elsik is unable to make out the third element of her prima facie case, Defendants are entitled to summary judgment on Elsik's discrimination claims under Title VII, § 1981, and the TCHRA.[30]

## II.      Intentional Infliction of Emotional Distress

Under Texas law, to establish the tort of intentional infliction of emotional distress ("IIED"), a plaintiff must show that (1) the defendant acted intentionally or recklessly, (2) the defendant's conduct was extreme and outrageous, (3) the defendant's actions caused the plaintiff emotional distress, and (4) the emotional distress suffered by the plaintiff was severe.  *Twyman v. Twyman*, 855 S.W.2d 619, 621 (Tex. 1993); *Ward v. Bechtel Corp.*, 102 F.3d 199, 203 (5th Cir. 1997).  However, the Texas Supreme Court has held that employment claims covered by other statutory remedies cannot alternatively be brought as IIED claims.  *Creditwatch, Inc. v. Jackson*, 157 S.W.3d 814, 816–17 (Tex. 2005) (finding "intentional infliction claims do not extend to ordinary employment disputes").  Specifically, the court stated the IIED claim is a "gap-filler" tort which was never intended to supplant or duplicate existing statutory or common-law remedies.  *Id.* at 816.  Therefore,

---

[30] Elsik's allegations are analogous to other cases in which the court granted summary judgment for failure to show constructive discharge.  *See Harvill v. Westward Commc'ns, LLC,* 433 F.3d 428, 439 (5th Cir. 2005) (finding allegations that new boss would get a bonus if he ran off plaintiff, a bogus racial harassment charge, unknown individual taking pictures of plaintiff outside the office, and the other workers and supervisors treating plaintiff in a hostile manner did not amount to constructive discharge); *Hunt v. Rapids Healthcare Sys., LLC,* 277 F.3d 757, 772 (5th Cir. 2001) (affirming summary judgment to the employer on constructive discharge where the resigning employee had been placed on a different shift accompanied by a loss in compensation and benefits); *Brown v. Bunge Corp.*, 207 F.3d 776, 782–83 (5th Cir. 2000) (finding no constructive discharge where the resigning employee showed he was demoted and had fewer job responsibilities); *Boze v. Branstetter*, 912 F.2d 801, 805–06 (5th Cir. 1990) (granting summary judgment for employer on constructive discharge where resigning employee suffered a poor performance evaluation and loss of responsibilities similar to a demotion).  As these cases demonstrate, Elsik's situation does not amount to constructive discharge.

because Elsik's IIED claim stems from the same factual allegations making up her discrimination claims against RNCP, RNCR, and KNCP, her IIED claim against these defendants cannot survive summary judgment. *Hoffman-La Roche, Inc. v. Zeltwanger*, 144 S.W.3d 438, 447–48 (Tex. 2004); *see also Goins v. Hitchcock I.S.D.*, 191 F. Supp. 2d 860, 871 (S.D. Tex. 2002) ("When a plaintiff alleges a claim for intentional infliction of emotional distress based on the same facts making up her Title VII claim, the former is preempted." (citing *Stewart v. Houston Lighting & Power Co.*, 998 F. Supp. 746, 757 n.8 (S.D. Tex. 1998)).

  A separate analysis is required regarding the IIED claim against Lacerda because he is not an "employer" subject to Title VII, § 1981 or the TCHRA.  Elsik alleges intentional infliction of emotional distress against Lacerda in her complaint based on Lacerda's remarks and alleged discrimination against her.  In order to prove an IIED claim, Elsik must prove that Lacerda's conduct was extreme and outrageous. *Twyman v. Twyman*, 855 S.W.2d 619, 621 (Tex.1993). Extreme and outrageous conduct is that which is "so extreme in degree, and so outrageous in character, as to go beyond all bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community." *Wornick Co. v. Casas*, 856 S.W.2d 732, 734 (Tex.1993).  "Only in the most unusual of employment cases does the conduct move out of the realm of an ordinary employment dispute and into the classification of extreme and outrageous as required for the tort of intentional infliction of emotional distress." *Porterfield v. Galen Hosp. Corp.*, 948 S.W.2d 916, 920-21 (Tex. App.-San Antonio 1997, writ denied).  Conduct that is merely insensitive or rude is not extreme and outrageous. *Tex. Farm Bureau Mut. Ins. Cos. v. Sears,* 84 S.W.3d 604, 610 (Tex. 2002).  Likewise, "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities do not rise to the level of extreme and outrageous conduct." *Id.*  In determining whether particular conduct

qualifies as "extreme and outrageous," courts consider the context and the relationship between the parties. *Id.* at 610-11. Additionally, within the employment context, courts must allow an employer "some discretion to 'supervise, review, criticize, demote, transfer, and discipline' its workers." *Id.* at 611 (quoting *GTE Sw., Inc. v. Bruce*, 998 S.W.2d 605, 611 (Tex.1999)).

In her complaint, Elsik has not set forth any conduct by Lacerda that could reasonably be construed as extreme and outrageous or as anything more than a few offhand remarks in two closed-door meetings. *See Am. Med. Int'l, Inc. v. Giurintano*, 821 S.W.2d 331, 341-42 (Tex. App.-Houston [14th Dist.] 1991, no writ.) (screaming at plaintiff, making allegedly racist comments, cursing, and threatening plaintiff was not extreme or outrageous as a matter of law); *Diamond Shamrock Refining & Marketing Co. v. Mendez*, 844 S.W.2d 198, 202 (Tex.1992) (holding that an employer's characterization of a former employee as a "thief" in the community was insufficiently "outrageous" to raise a fact issue).   There is certainly summary judgment evidence that supports Lacerda's contention that he was advising her, as her supervisor, of the complaints employees and residents made regarding Elsik's behavior.   Here, the Court finds that any alleged remarks made by Lacerda did not rise to the level of extreme and outrageous conduct.   Further, Elsik has offered nothing to substantiate that emotional distress was actually suffered or that such distress was severe. Therefore, Elsik's claim for intentional infliction of emotional distress against Lacerda fails as a matter of law.

## III.   Slander

Defendant Lacerda will be granted summary judgment on this ground because Elsik concedes her claim is barred by the statute of limitations.[31]

---

[31] D's M.S.J. (dkt. #24), Ex. B, Elsik's Depo., p. 6.

**Conclusion**

For the reasons stated, the court finds that Plaintiff has failed to create a genuine issue of material fact for any of her claims.  Therefore, Defendants' Motion for Summary Judgment (dkt. # 24) is GRANTED.

It is so ORDERED.

SIGNED this 22nd day of August, 2007.

JOHN D. RAINEY
UNITED STATES DISTRICT JUDGE

17